AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>ONE BLACK APPLE IPHONE MORE FULLY<br>DESCRIBED IN ATTACHMENT A. | )<br>)<br>)<br>)<br>)<br>) |

Case No.  4:22 MJ 8101 SRW

SIGNED AND SUBMITTED TO THE COURT FOR
FILINGBY RELIABLE ELECTRONIC MEANS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
ONE BLACK APPLE IPHONE MORE FULLY DESCRIBED IN ATTACHMENT A.

located in the _____EASTERN_____ District of _____MISSOURI_____ , there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C. 841, 846 | distribution of a controlled substance and conspiracy to possess with the intent to |
| Title 18, U.S.C. 922, 924 | distribute a controlled substance; firearms offenses |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under penalty of perjury that the foregoing is true and correct.

_____
*Applicant's signature*

David Morton, Special Agent, DEA
*Printed name and title*

Sworn, to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date: _____04/26/2022_____

_____
*Judge's signature*

City and state:  St. Louis, MO

Honorable Stephen Welby, U.S. Magistrate Judge
*Printed name and title*

AUSA:  ANGIE DANIS

## ATTACHMENT A

The property to be searched is one black in color Apple iPhone with an unknown IMEI and unknown phone number, and any SIM card contained therein, belonging to Damon PRUITT, hereinafter referred to as the "**the Device**," which is photographed below. The **Device** is currently in possession of the DEA. The **Device** was seized from Damon PRUITT following his arrest in St. Louis, Missouri and is currently being stored at the DEA-St. Louis Division Office, which is located within the Eastern District of Missouri.

This warrant authorizes the forensic examination of the **Device** for the purpose of identifying the electronically stored information described in Attachment B.

 

## ATTACHMENT B

1.     All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 922(g) and 924(c) and involve Damon PRUITT and/or others known and unknown, including:

    a.  Lists of customers and related identifying information;

    b.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d.  Any information recording PRUITT's schedule or travel;

    e.  All bank records, checks, credit card bills, account information, and other financial records.

2.     Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.     Records evidencing the use of Internet Protocol addresses, including:

    a.  records of Internet Protocol addresses used;

    b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| ONE BLACK APPLE IPHONE MORE | ) | No. 4:22 MJ 8101 SRW |
| FULLY DESCRIBED IN ATTACHMENT | ) | |
| A. | ) | FILED UNDER SEAL |
| | ) | SIGNED AND SUBMITTED TO THE COURT |
| | ) | FOR FILING BY RELIABLE ELECTRONIC MEANS |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A SEARCH WARRANT

I, David Morton, being first duly sworn via reliable electronic means, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – an electronic device – described in Attachment A, which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Drug Enforcement Administration (DEA), and have been so employed since May 2018. I am currently assigned to the DEA's St. Louis Division Office (SLDO), specifically Group 33. I have completed the in-resident, 18-week DEA Basic Agent Training program at the DEA Academy in Quantico, Virginia, which provided extensive training in all aspects of the investigation of drug trafficking activities and organizations. Prior to my employment with the DEA, I was a Soldier in the United States Army for over six years and served as an enlisted Special Agent of the United States Army Criminal Investigation Command (CID) for the three years prior to my employment with DEA.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     I am familiar with and have used normal methods of investigation, including, but not limited to, visual and electronic surveillance, questioning of defendants and witnesses, the use of search and arrest warrants, the use of pen registers, the use of undercover agents, the use of confidential sources, and the use of court-authorized wire intercepts. Based upon my training, experience, and understanding of this investigation, I believe that individuals engaged in drug trafficking often keep and maintain certain evidence of their crimes in their electronic devices, to include the items set forth in Attachment B.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 922(g) and 924(c) have been committed by Damon PRUITT, and/or other persons known and unknown.   There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

**LOCATION TO BE SEARCHED AND IDENTIFICATION OF THE DEVICE**

6.     The property to be searched is one black in color Apple iPhone with an unknown IMEI and unknown phone number, and any SIM card contained therein, belonging to Damon PRUITT, hereinafter referred to as the "**the Device**," which is photographed in Attachment A. The **Device** is currently in possession of the DEA.  As described herein, the **Device** was seized

2

from Damon PRUITT following his arrest in St. Louis, Missouri and is currently being stored at the DEA-St. Louis Division Office, which is located within the Eastern District of Missouri.

7.     The applied-for warrant would authorize the forensic examination of the device for the purpose of identifying electronically stored data particularly described in Attachment B.

## **TECHNICAL TERMS**

8.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. A wireless telephone may have wireless connection capabilities such as Wi-Fi and Bluetooth.

3

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.   The Global Positioning System (generally abbreviated

4

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication Devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication Devices and can be used to access the

Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the internet, connections between devices on the internet often cross state and international borders, even when the devices communicating with each other are in the same state.

6

9.     Based on my training, experience, and research, I know that the **Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the **Device**.

## PROBABLE CAUSE

10.     On the morning of March 24, 2022, St. Louis Metropolitan Police Department (SLMPD) Detective (Det.) Trevor Russell was contacted by a United Parcel Service (UPS) security supervisor about a suspicious UPS package intercepted by one of his employees earlier that morning.

11.     Det. Russell responded to the UPS facility, located at 520 South Jefferson Avenue, St. Louis MO 63103, and took custody of the UPS package. Det. Russell spoke with the security supervisor, who related the delivery driver assigned to deliver the package noticed the package's listed sender was an individual, rather than a business, and that the listed recipient was also an individual. The delivery driver, who is an experienced UPS employee, believed this was suspicious due to the extremely high cost of paying for early morning delivery given that the package was sent from one individual to another. The driver also noticed the package was sent from a UPS store in California. Experienced interdiction investigators commonly consider these same factors to be indicators that a package may contain contraband.

12.     In accordance with UPS policy, the delivery driver opened the package to ensure that it did not contain contraband. Upon opening the UPS package, the driver observed that the package contained possible contraband and notified the security supervisor.

7

13.     Det. Russell then examined the package and found that it contained four, triple-vacuum sealed bags containing white, opaque crystals, and believed, based on his training and experience, that the substance contained in the vacuum sealed bags to be crystal methamphetamine. Det. Russell conducted a field test of a small sample of the substance, which tested presumptively positive as methamphetamine. The suspected methamphetamine was later determined to weigh approximately 6,831 grams.

14.     Det. Russell found that the package also contained an additional two bricks of compressed white powder, which emanated a strong chemical odor, and believed, based on his training and experience, that the bricks contained cocaine. Det. Russell conducted a field test of a small sample of the bricks, which tested presumptively positive as cocaine. The suspected cocaine was later determined to weigh approximately 2,095 grams.

15.     Det. Russell reviewed the UPS package's address label, which revealed it was shipped from a UPS store in Irvine, California, with an intended delivery location of a residence in south St. Louis City, MO. Reviews of open source and law enforcement databases revealed the names of the sender and shipper listed on the package were likely fictitious.

16.     In an effort to further the investigation, SLMPD and DEA St. Louis investigators conducted a controlled delivery of the UPS package to the listed delivery address. Prior to the controlled delivery, Det. Russell and SLMPD Det. David Wilson removed the suspected methamphetamine and cocaine from the UPS package, then added similar amounts of fake or "sham" methamphetamine and cocaine, then repacked the parcel in a manner similar to how it was originally discovered.

17.     Later on the same day at approximately 11:10 a.m., an SLMPD detective disguised as a UPS employee delivered the UPS package to the listed delivery address, 6605

8

Pennsylvania Avenue, St. Louis, MO 63111, as additional DEA and SLMPD investigators conducted surveillance in the area. The detective rang the camera-type doorbell twice, knocked on the door, then left the UPS package in front of the residence's door and departed.

18.     Minutes later, a Silver Nissan Altima with a Missouri temporary tag and solely occupied by female driver later identified as Jarvis Nunley, arrived at 6605 Pennsylvania Ave. Jarvis Nunley was observed taking the package inside of the residence. Minutes later, Jarvis Nunley was observed exiting the residence, entering her vehicle, and parking in the garage of the residence located at 6616 Minnesota Ave, St. Louis, MO, then lowering the garage door. It is notable that the residence at 6616 Minnesota is one street northwest of 6605 Pennsylvania, and the rear of 6605 Pennsylvania is easily observed from the rear of 6616 Minnesota.

19.     At approximately 2:15 p.m., investigators observed Jarvis Nunley depart her residence in the Nissan Altima. Investigators followed the vehicle before conducting a traffic stop. In a post-Miranda statement, Jarvis Nunley stated that she lives at 6616 Minnesota Ave, and that her daughter, Jarmeshia Nunley, lives at 6605 Pennsylvania Ave. Jarvis Nunley stated that her daughter, Jarmeshia Nunley, was at work and called her because of a package being delivered to her residence. Jarvis Nunley stated Jarmeshia Nunley asked her to take the package inside of her residence to prevent it from being stolen.

20.     At approximately 2:18 pm, investigators in the area of 6605 Pennsylvania observed a black Ford Edge solely occupied by a male driver later determined to be Damon PRUITT arrive at 6605 Pennsylvania Ave, and park in the residence's garage.

21.     At approximately 2:30 pm, SLMPD detectives converged on the residence at 6605 Pennsylvania Ave to secure the area while awaiting issuance of a search warrant for the residence. During this time, investigators observed PRUITT at the window with his cell phone

9

(believed to be the **Device**). PRUITT appeared to be using the telephone to record the officers outside. Investigators heard PRUITT loudly moving throughout the residence, making a lot of banging noises, and running some type of appliance. Several orders were given by police to exit the residence, but PRUITT refused.

22.   At approximately 3:30 pm, the SLMPD SWAT Team was advised of the situation and informed the search warrant for 6605 Pennsylvania Avenue had been signed by the Honorable Judge David Roither, at which time they made entry into the residence at 6605 Pennsylvania Ave. The residence was solely occupied by PRUITT.

23.   At approximately 4:20 pm, homeowner Jarmeshia Nunley arrived at 6605 Pennsylvania Avenue. Jarmeshia Nunley advised investigators the only person in her residence was her boyfriend, referring to PRUITT. Jarmeshia Nunley told investigators that she had come from a beauty shop appointment, which contradicted her mother's previous statement that Jarmeisha Nunley was at work.

24.   Det. Wilson directed his drug detection canine "Noco" to conduct a sniff of the residence. Detective Wilson observed "Noco" indicated to the presence of a drug odor in multiple locations throughout the residence, including the kitchen trash can, the toilet in the second-floor master bathroom, and the headboard of the master bedroom bed.

25.   Investigators located a gallon sized zip lock bag in the kitchen trash can, which held a small amount of water. A strong odor of cocaine emanated from the bag. Investigators also located shredded pieces of plastic bag material in the garbage disposal in the kitchen, which is the appliance investigators believe they heard while outside of the residence. Investigators believed PRUITT was actively destroying and hiding evidence prior to the execution of the search warrant.

10

26.     Investigators located two firearms on the floor of the master bedroom closet, as well as $21,290.00 United States currency hidden in two air vents. One of the two air vents was located in the master bedroom behind the bed, in the area where canine "Noco" previously alerted to the presence of a drug odor.

27.     The **Device** was also located in the residence during the search. I placed the **Device** into airplane mode to prevent the potential loss or destruction of any evidence contained on the **Device**; this was accomplished by accessing the **Device**'s lock screen and did not require any intrusion into any password protected component of the device. PRUITT informed Special Agent (SA) Michael Tiderington that the **Device** belonged to him and provided a phone number for the **Device** to SA Tiderington. SA Tiderington later briefly took the **Device** off of airplane mode and dialed the phone number provided by PRUITT while holding the **Device**. The phone did not ring, which indicated to SA Tiderington that PRUITT provided a fictitious phone number. The **Device** was then placed back in airplane mode. SA Tideirngton seized the phone as evidence and transported the **Device** to the DEA St. Louis Division Office, where it was submitted into evidence. The subject telephone is currently secured in the DEA St. Louis evidence vault.

28.     In a post-Miranda statement, Jarmeshia Nunley stated that she lives at 6605 Pennsylvania Ave, and that she observed a package being delivered to her residence via her ring doorbell. Jarmeshia Nunley stated that she was not expecting a package, but frequently orders packages online. Jarmeshia Nunley stated that she called her mother Jarvis Nunley and asked her to respond to her residence and take the package inside so that it would not be stolen. Jarmeshia Nunley stated that she did not know there were any weapons in the residence, nor was she aware of the presence of any large sums of U.S. Currency.

29.     In a post-Miranda statement, PRUITT stated he received a phone call from Jarmeshia Nunley earlier that day about a package being delivered to the residence, and that he responded to the residence to take a shower while Jarmeshia Nunley was at the beauty shop. PRUITT stated that he took a shower, and did not hear investigators outside of the residence until after he was dressed. TFO Wallace noted that the shower had not been used, nor did investigators observe any wet towels or water in the tub/shower enclosure. PRUITT stated that he observed several detectives outside of the residence with items clearly identifying them as "POLICE," but that Jarmeshia Nunley told him not to open the door. PRUITT stated that he uses drugs, and that he had approximately 1 ounce of "powder cocaine" for personal use that he attempted to dispose of by adding water to it. PRUITT claimed ownership of both firearms found in the residence, and claimed the U.S. Currency belonged to Jarmeshia Nunley after initially denying knowledge of any large amounts of U.S. currency present in the residence. This contradicted Jarmeshia Nunley's statement that she was unaware of any large sums of U.S. currency. PRUITT was arrested and processed. On March 25, 2022, a federal complaint for the offense of Felon in Possession of a Firearm was issued in the Eastern District of Missouri.

30.     On March 25, 2022, Det. Wilson contacted United States Postal Inspection Service (USPIS) Inspector J. Woodland about this investigation, as individuals engaged in drug trafficking frequently use multiple shipping services to transport and distribute controlled substances. Inspector Woodland researched the address of 6605 Pennsylvania Avenue, St. Louis, MO 63111 in United States Postal Service (USPS) databases and learned that the address had previously received multiple USPS packages weighing approximately four to five pounds; these packages had a digital profile consistent with USPS packages found to contain controlled substances or the proceeds of drug sales.

12

31.     During this research, Inspector Woodland identified two USPS packages sent from Jarupa, California addressed to 6605 Pennsylvania Avenue that were expected to be delivered that day. Both packages were listed in USPS records as "out for delivery." Inspector Woodland seized both packages while they were located at the Maryville Gardens Post Office prior to their delivery.

32.     A federal search warrant for both packages was issued in the Eastern District of Missouri. Execution of the search warrant revealed one package contained approximately three pounds of marijuana, and the other package contained approximately one pound of marijuana.

33.     On March 30, 2022, PRUITT was indicted by a federal grand jury in the Eastern District of Missouri for the offenses of Felon in Possession of a Firearm, Conspiracy to Distribute Methamphetamine, Cocaine, and Marijuana, and Possession of a Firearm in Furtherance of Drug Trafficking.

34.     In my training and experience, I know that the **Device** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the device first came into the possession of the investigative agency(ies).

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

35.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

36.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

13

the **Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Device** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

14

37.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Device** consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Device** to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

38.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Device** described in Attachment A to seek the items described in Attachment B.

39.     Because this warrant seeks only permission to examine a **Device** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

40.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.   I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.   Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through the carding forums.   Premature disclosure of the contents of this affidavit

and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

**I state under penalty of perjury that the foregoing is true and correct.**

Respectfully submitted,

DAVID MORTON
Special Agent
Drug Enforcement Administration (DEA)

**Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 this** __26th__day of April, 2022.

STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

The property to be searched is one black in color Apple iPhone with an unknown IMEI and unknown phone number, and any SIM card contained therein, belonging to Damon PRUITT, hereinafter referred to as the **"the Device**," which is photographed below. The **Device** is currently in possession of the DEA. The **Device** was seized from Damon PRUITT following his arrest in St. Louis, Missouri and is currently being stored at the DEA-St. Louis Division Office, which is located within the Eastern District of Missouri.

This warrant authorizes the forensic examination of the **Device** for the purpose of identifying the electronically stored information described in Attachment B.




**ATTACHMENT B**

1.     All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 922(g) and 924(c) and involve Damon PRUITT and/or others known and unknown, including:

    a.   Lists of customers and related identifying information;

    b.   Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.   Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d.   Any information recording PRUITT's schedule or travel;

    e.   All bank records, checks, credit card bills, account information, and other financial records.

2.     Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.     Records evidencing the use of Internet Protocol addresses, including:

    a.   records of Internet Protocol addresses used;

    b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.